1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TRAVARE GRANT,                          No.  2:  14-cv-1867 MCE KJN P

12              Plaintiff,

13         v.                                ORDER AND FINDINGS AND
                                             RECOMMENDATIONS
14   MATTHEW CATE, et al.,

15              Defendants.

16

17   I.  Introduction

18         Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant

19   to 42 U.S.C. § 1983.  Pending before court is defendants' summary judgment motion.  (ECF No.

20   69.)  Defendants move for summary judgment on the merits of plaintiff's claims and on the

21   grounds that plaintiff failed to exhaust administrative remedies.  For the reasons stated herein, the

22   undersigned recommends that defendants' motion be granted.

23   II.  Legal Standard for Summary Judgment

24         Summary judgment is appropriate when it is demonstrated that the standard set forth in

25   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

26   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

27   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

28   ////

                                              1

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).

"Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

2   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

3   (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

4   1564, 1575 (9th Cir. 1990).

5          In the endeavor to establish the existence of a factual dispute, the opposing party need not

6   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

7   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

8   trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

9   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

10  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

11  amendments).

12         In resolving a summary judgment motion, the court examines the pleadings, depositions,

13  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

14  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

15  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

16  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

17  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

18  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

19  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

20  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

21  some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

22  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

23  trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

24         By contemporaneous notice provided on August 16, 2013(ECF No. 22), plaintiff was

25  advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

26  Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

27  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

28  ////

3

1    III.  Plaintiff's Claims

2         This action is proceeding on the amended complaint filed October 31, 2014 as to

3    defendants Moss, Jason, Brown and Huser.[1]  (ECF No. 17.)  Plaintiff alleges that on November

4    17, 2011, he was transferred to the North Fork Correctional Facility ("NFCF"), located in

5    Oklahoma.[2]  At the time of plaintiff's transfer, African American inmates at NFCF were on an

6    emergency lockdown following a riot between Hispanic and African American inmates.  (Id.)

7    Plaintiff is African American.  (Id. at 3-4.)

8         Plaintiff alleges that upon his arrival at NFCF, he was labeled as a threat because he is

9    African American, even though he was not involved in the riot.  (Id.)  Plaintiff was told that he

10   would be placed on lockdown.  (Id. at 4.)  Plaintiff alleges that other inmates who arrived at

11   NFCF after the riot who were not African American were not placed on the lockdown.  (Id.)  As a

12   result of being placed on lockdown, plaintiff was denied access to work, school and recreation

13   activities.  (Id.)  Plaintiff alleges that he was on lockdown for 11 months.  (Id.)

14        Plaintiff alleges that on January 25, 2012, defendants Jason, Brown and Huber denied his

15   request for a transfer back to California following a classification hearing at NFCF.  (Id.)

16   Plaintiff alleges that during the classification hearing, plaintiff argued that he should not be on

17   lockdown because he was not involved in the riot.  (Id.)

18   ////

19   _____

20   [1]  Defendants filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of
     Civil Procedure 12(b)(6).  (ECF No. 34.)  The court granted defendants' motion to dismiss as to
21   defendant Cate.  (ECF No. 43.)  The court denied defendants' motion to dismiss as to defendants
     Moss, Jason, Brown and Huser.  (Id.)

22   [2]  NFCF is a California Out-of-State Correctional Facility ("COCF") under California's COCF
23   program to relieve overcrowding in California state prisons.  The COCF program is one in which
     male California Department of Corrections and Rehabilitation ("CDCR") inmates are transferred
24   to out-of-state correctional facilities that have contracted with CDCR to provide housing,
     security, health care and rehabilitative programming services to CDCR inmates.  Cal. Code Regs.
25   tit. 15, § 3000.  COCF is a unit within the CDCR-Division of Adult Institutions whose mission is
     to transfer inmates out of state for the purpose of alleviating overcrowding within existing
26   institutions.  James v. Sweeney, 2013 WL 129393, at *1 n. 1 (E.D. Cal. Jan. 9, 2013).  "Inmates
27   transferred to a COCF program facility 'remain under the legal custody of the CDCR and shall be
     subject to the rules, rights and privileges of the CDCR in accordance with [Title 15] of the
28   California Code of Regulations.'"  Id. at 4, n. 7 (citing Cal. Code Regs. tit. 15, § 3379(a)(9)(I)).

4

1    Plaintiff alleges that defendant Moss, the Chief Deputy Warden at the CDCR Contract

2    Beds Unit in Rancho Cordova, California, denied plaintiff's administrative appeal at the second

3    level.  (Id.)  Defendant Moss stated that plaintiff was a threat to the security of the facility, i.e.,

4    NFCF.  (Id.)  Plaintiff alleges that defendant Moss ordered that plaintiff remain on lockdown.

5    (Id.)

6    Plaintiff alleges that his placement and retention on lockdown following his arrival at

7    NFCF violated his right to Equal Protection and his rights under the Eighth Amendment.  (Id. at

8    3.)

9    IV.  Administrative Remedies

10       A.  Legal Standard for Exhaustion of Administrative Remedies

11       The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be

12   brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a

13   prisoner confined in any jail, prison, or other correctional facility until such administrative

14   remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion

15   requirement applies to all inmate suits about prison life, whether they involve general

16   circumstances or particular episodes, and whether they allege excessive force or some other

17   wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).

18       Proper exhaustion of available remedies is mandatory, Booth v. Churner, 532 U.S. 731,

19   741 (2001), and "[p]roper exhaustion demands compliance with an agency's deadlines and other

20   critical procedural rules[.]"  Woodford v. Ngo, 548 U.S. 81, 90 (2006).  The Supreme Court has

21   also cautioned against reading futility or other exceptions into the statutory exhaustion

22   requirement.  See Booth, 532 U.S. at 741 n.6.  Moreover, because proper exhaustion is necessary,

23   a prisoner cannot satisfy the PLRA exhaustion requirement by filing an untimely or otherwise

24   procedurally defective administrative grievance or appeal.  See Woodford, 548 U.S. at 90-93.

25   "[T]o properly exhaust administrative remedies prisoners 'must complete the administrative

26   review process in accordance with the applicable procedural rules,' -- rules that are defined not by

27   the PLRA, but by the prison grievance process itself."  Jones v. Bock, 549 U.S. 199, 218 (2007)

28   (quoting Woodford, 548 U.S. at 88).  See also Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir.

5

2009) ("The California prison system's requirements 'define the boundaries of proper exhaustion.'") (quoting Jones, 549 U.S. at 218).

In California, prisoners may appeal "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). On January 28, 2011, California prison regulations governing inmate grievances were revised. Cal. Code Regs. tit. 15, § 3084.7. Now inmates in California proceed through three levels of appeal to exhaust the appeal process: (1) formal written appeal on a CDC 602 inmate appeal form; (2) second level appeal to the institution head or designee; and (3) third level appeal to the Director of the California Department of Corrections and Rehabilitation ("CDCR"). Cal. Code Regs. tit. 15, § 3084.7. Under specific circumstances, the first level review may be bypassed. Id. The third level of review constitutes the decision of the Secretary of the CDCR and exhausts a prisoner's administrative remedies. See id. § 3084.7(d)(3). Since 2008, medical appeals have been processed at the third level by the Office of Third Level Appeals for the California Correctional Health Care Services. A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available to him. Butler v. Adams, 397 F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d 1096, 1098 (9th Cir. 2002). Since the 2011 revision, in submitting a grievance, an inmate is required to "list all staff members involved and shall describe their involvement in the issue." Cal. Code Regs. tit. 15, § 3084.2(3). Further, the inmate must "state all facts known and available to him/her regarding the issue being appealed at the time," and he or she must "describe the specific issue under appeal and the relief requested." Cal. Code Regs. tit. 15, §§ 3084.2(a)(4). An inmate now has thirty calendar days to submit his or her appeal from the occurrence of the event or decision being appealed, or "upon first having knowledge of the action or decision being appealed." Cal. Code Regs. tit. 15, § 3084.8(b).

Failure to exhaust is "an affirmative defense the defendant must plead and prove." Bock, 549 U.S. at 204, 216. In Albino, the Ninth Circuit agreed with the underlying panel's decision "that the burdens outlined in Hilao v. Estate of Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996),

1   should provide the template for the burdens here." Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir.

2   2014) (en banc).  A defendant need only show "that there was an available administrative remedy,

3   and that the prisoner did not exhaust that available remedy." Albino, 747 F.3d at 1172.  Once the

4   defense meets its burden, the burden shifts to the plaintiff to show that the administrative

5   remedies were unavailable.  See Albino, 697 F.3d at 1030-31.

6          A prisoner may be excused from complying with the PLRA's exhaustion requirement if

7   he establishes that the existing administrative remedies were effectively unavailable to him.  See

8   Albino, 747 F.3d at 1172-73.  When an inmate's administrative grievance is improperly rejected

9   on procedural grounds, exhaustion may be excused as effectively unavailable.  Sapp v. Kimbrell,

10  623 F.3d 813, 823 (9th Cir. 2010); see also Nunez v. Duncan, 591 F.3d 1217, 1224-26 (9th Cir.

11  2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable");

12  Ward v. Chavez, 678 F.3d 1042, 1045 (9th Cir. 2012) (exhaustion excused where futile); Brown

13  v. Valoff, 422 F.3d 926, 940 (9th Cir. 2005) (plaintiff not required to proceed to third level where

14  appeal granted at second level and no further relief was available).

15         Where a prison system's grievance procedures do not specify the requisite level of detail

16  for inmate appeals, Sapp, 623 F.3d at 824, a grievance satisfies the administrative exhaustion

17  requirement if it "alerts the prison to the nature of the wrong for which redress is sought." Griffin

18  v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).  "A grievance need not include legal terminology

19  or legal theories unless they are in some way needed to provide notice of the harm being grieved.

20  A grievance also need not contain every fact necessary to prove each element of an eventual legal

21  claim.  The primary purpose of a grievance is to alert the prison to a problem and facilitate its

22  resolution, not to lay groundwork for litigation." Griffin, 557 F.3d at 1120.

23         If under the Rule 56 summary judgment standard, the court concludes that plaintiff has

24  failed to exhaust administrative remedies, the proper remedy is dismissal without prejudice.

25  Wyatt v. Terhune, 315 F.3d 1108, 1120 (9th Cir. 2003), overruled on other grounds by Albino,

26  747 F.3d 1162.

27  ////

28  ////

1    B. Discussion

2    Defendants argue that plaintiff failed to exhaust his administrative remedies because he

3    failed to name them in a grievance and because he submitted a grievance after their alleged

4    involvement in the case.  In support of these arguments, defendants cite the administrative

5    grievances attached to the original complaint.  Plaintiff does not dispute that these are the

6    grievances which allegedly exhausted his claims.

7    The undersigned begins by summarizing the relevant administrative grievances.  The

8    undersigned observes that these grievances were prepared on CDCR forms.  NFCF officials

9    appear to have responded to the first level grievance.  CDCR officials responded to the second

10   and third level grievances.

11   Plaintiff filed his first level grievance regarding the lockdown on January 30, 2012.  (ECF

12   No. 13.)  In this grievance, plaintiff complained that he was wrongly placed on lockdown because

13   he did not participate in the riot that led to the lockdown.  (Id.)  As relief, plaintiff requested that

14   his privileges be restored and that he be allowed to work.  (Id.)  This grievance was denied at the

15   First Level of Review.  (Id. at 19.)  The memorandum denying the first level grievance stated that

16   plaintiff requested that he be allowed to attend his job and receive the same privileges as other

17   inmates not currently on modified programming.  (Id.)

18   Plaintiff filed a second level grievance requesting that he be released from lockdown and

19   given access to dayroom, yard and education.  (Id. at 14.)  Defendant Moss denied this grievance

20   at the second level of review.  (Id. at 17.)  Plaintiff then appealed to the Director's Level.  This

21   grievance was also denied.  (Id. at 11-12.)  The memorandum denying the third level grievance

22   stated that plaintiff requested that he be provided with privileges and be allowed to participate in

23   a work assignment.  (Id. at 11.)

24   In the grievances summarized above, it is clear that plaintiff requested that he be released

25   from the lockdown and to have his "privileges" restored.  Plaintiff did not request that he be

26   transferred back to California.

27   For the following reasons, the undersigned finds that plaintiff failed to exhaust

28   administrative remedies with respect to his claims against defendants Jason, Brown and Huber.

8

1    The gravamen of plaintiff's claim against these defendants is that they denied his request to be

2    transferred to a prison in California.

3         As discussed above, plaintiff alleges that these defendants denied his request to be

4    transferred back to California during a classification committee hearing. While plaintiff alleges

5    that the hearing occurred on January 25, 2012, the memorandum prepared following the hearing

6    states that it occurred on January 31, 2012.  (ECF No. 17 at 6.)  The memorandum also states, in

7    relevant part, "Grant requested a transfer back to California.  Grant was informed that COCF was

8    not performing any convenience moves at this time."  (Id.)

9         The level of detail in an administrative grievance necessary to exhaust a claim is

10   determined by the prison's grievance procedures.  Jones v. Bock, 549 U.S. 199, 218 (2007).

11   "[W]hen a prison's grievance procedures are silent or incomplete as to factual specificity, 'a

12   grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'"

13   Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009) (quoting Strong v. David, 297 F.3d 646,

14   650 (7th Cir. 2002)).

15        As discussed above, plaintiff's grievances were filed on CDCR grievance forms. The

16   California regulations require an inmate to describe the specific issue under appeal and the relief

17   requested.  Cal. Code Regs. tit. 15, § 3084.2.  And under CDCR regulations, "[a]dministrative

18   remedies shall not be considered exhausted relative to any new issue, information, or person later

19   named by the appellant that was not included in the originally submitted [appeal] and addressed

20   through all required levels of administrative review up to and including the third level."  Cal.

21   Code Regs. tit. 15, § 3084.1(b).  Accordingly, in California, a prisoner must describe the specific

22   issue of which he complains in his grievance, and does not exhaust administrative remedies when

23   he includes entirely new issues from one level of review to another.  See Sapp v. Kimbrell, 623

24   F.3d 813, 825 (9th Cir. 2010) (concluding that it was proper for prison officials to "decline[ ] to

25   consider a complaint about [prisoner's] eye condition that he raised for the first time in a second-

26   level appeal about medical care for a skin condition.").

27        Nevertheless, because California's regulations are "'incomplete as to the factual specificity

28   [required in an inmate's grievance], a grievance [in California] suffices if it alerts the prison to the

9

1  nature of the wrong for which redress is sought.'" Id. at 824 (quoting Griffin, 557 F.3d at 1120)

2  (first alteration in original).  In other words, a California prisoner's "grievance...need not contain

3  every fact necessary to prove each element of an eventual legal claim," Griffin, 557 F.3d at 1120,

4  so long as it "puts the prison on adequate notice of the problem for which the prisoner seeks

5  redress." Sapp, 623 F.3d at 824.

6         Plaintiff's grievances did not exhaust his claims against defendants Jason, Brown and

7  Huber because they did not challenge defendants' decision to deny his request for a transfer back

8  to California or mention the at-issue classification committee hearing.  In the grievances, as relief,

9  plaintiff did not request that he be transferred back to California.  This is most likely because the

10  at-issue classification committee hearing occurred after plaintiff filed his first level grievance.

11  For these reasons, plaintiff's grievances did not put defendants on notice that he challenged their

12  decision to deny his request for a transfer.  Accordingly, defendants Jason, Brown and Huber

13  should be granted summary judgment based on these grounds.

14         Plaintiff's claim against defendant Moss is based on defendant Moss's denial of his

15  second level grievance.  In this grievance, plaintiff challenged his placement and retention on

16  lockdown and requested that his privileges be restored.  Defendants suggest that plaintiff did not

17  exhaust his administrative remedies against defendant Moss because plaintiff filed his first level

18  grievance before defendant Moss denied his second level grievance.  In essence, defendants

19  suggest that plaintiff was required to file another round of grievances challenging defendant

20  Moss's denial of the second level grievance.  The undersigned disagrees.  Plaintiff was not

21  required to file another round of administrative grievances challenging defendant Moss's denial

22  of his grievance.  Moreover, it is unlikely that such duplicative grievances would even be

23  permitted.  Accordingly, the undersigned finds that plaintiff exhausted his administrative

24  remedies as to defendant Moss.

25  V.  Statute of Limitations

26         Defendants move for summary judgment on grounds that plaintiff's claims are barred by

27  the statute of limitations.  Defendants argue that the court should apply the Oklahoma statute of

28  limitations, under which plaintiff's claims would be time barred.

1   Citing Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 973 (9th Cir.

2   2013), defendants argue that the federal court in which the case is litigated should apply the

3   forum state's choice of law.  Defendants argue that, under California law, Oklahoma is the choice

4   of law for the statute of limitations.

5   Federal courts apply the forum state's choice of law in cases based on diversity

6   jurisdiction.  See id. at 973; Nelson v. International Paint Co., 716 F.2d 640, 643 (9th Cir. 1983)

7   ("In diversity cases, the district court normally applies the substantive law of the forum state,

8   including its choice of law rules.")  However, the instant case is not brought based on diversity

9   jurisdiction.  See 28 U.S.C. § 1332; see Hunter v. Philip Morris USA, 582 F.3d 1039, 1043 (9th

10   Cir. 2009) (diversity of citizenship exists only where there is complete diversity, that is, "where

11   the citizenship of each plaintiff is different from that of each defendant.").  Instead, this action

12   arises under federal question jurisdiction.  See 18 U.S.C. § 1331.  Federal civil rights actions are

13   subject to the forum state's statute of limitations applicable to personal injury claims.  Wallace v.

14   Kato, 549 U.S. 384, 387 (2007).  Therefore, the California statute of limitations is applicable.

15   Defendants do not appear to argue that this action is untimely under California law.  As

16   discussed herein, plaintiff's claims are timely under the California statute of limitations.

17   Plaintiff's claims accrued on the date he transferred to Oklahoma, i.e., November 17,

18   2011.  See Wallace, 549 U.S. at 388 ("the accrual date of a § 1983 cause of action is a question

19   of federal law that is not resolved by reference to state law"); Bradford v. Scherschligt, 803 F.3d

20   382, 387-88 (9th Cir. 2015) (claim accrued on the day that plaintiff knew or had reason to know

21   of the injury).  Under California law, plaintiff had four years from that date to file a timely federal

22   action.  See Maldonado v. Harris, 370 F.3d 945, 954 (9th Cir. 2004); Cal. Civ. Code § 335.1 (two

23   year statute of limitations); Cal. Civ. Code §§ 352.1, 357 (incarceration tolls the statute of

24   limitations for two years for inmates serving less than life).[3]

25   Plaintiff filed this action on July 24, 2014.  Because this action was filed within four years

26   of the date the injury accrued, this action is not barred by the statute of limitations.  Defendants

27

28   [3]   The parties do not dispute that plaintiff is serving a term less than life.

1    are not entitled to summary judgment on this ground.

2    VI.  Clarification of Claims

3          Because plaintiff failed to exhaust his administrative remedies as to defendants Jason,

4    Brown and Huber, the undersigned need not address the defendants' summary judgment motion

5    addressing the merits of plaintiff's claims against these defendants.  Before analyzing defendants'

6    summary judgment addressing the merits of plaintiff's claims against defendants Moss, the

7    undersigned herein clarifies plaintiff's claims against this defendant.

8          First, plaintiff alleges that his placement and retention on the lockdown violated his Equal

9    Protection rights because he did not participate in the incident that led to the lockdown.  In other

10   words, plaintiff does not raise an Equal Protection claim challenging the validity or duration of

11   the lockdown per se.  Second, plaintiff alleges that the denial of access to work, educational and

12   recreation activities, i.e., access to outdoor exercise, during the lockdown violated the Eighth

13   Amendment.

14         The undersigned also clarifies that plaintiff is basing the liability of defendant Moss on

15   defendant's denial of plaintiff's second level administrative grievance challenging his placement

16   and retention on the lockdown.  (ECF No. 17 at 4.)  Plaintiff alleges that defendant Moss

17   improperly found that plaintiff posed a threat to the security of NFCF and denied his request to be

18   released from the lockdown.  (Id.)  Plaintiff alleges that defendant Moss ignored his claim that he

19   was not involved in any riot.  (Id.)  Defendant Moss's June 20, 2012 response to plaintiff's

20   second level grievance states, in relevant part,

21         Issue:  The appellant is submitting this appeal relative to modified
           programing at North Fork Correctional Facility (NCFC) claiming
22         that it is race based, punitive and in bad faith.  Furthermore, it does
           not allow for out of cell privileges and attending job assignments.
23
           The appellant requests on appeal that he be allowed to participate in
24         out of cell privileges and attend his job assignment.

25         ****

26         The appellant's submitted appeal (NF-03—12-010) was denied at
           the FLR on March 28, 2012.  The FLR denied the appeal based on
27         the fact that the appellant was identified as a member of a security
           threat group with a significant participation in the October 11, 2011
28         incident at NFCF.

12

NFCF has utilized modified programs during situations where a disruption of orderly operations is caused by inmate initiated disturbance(s). The modified programs are prudent actions by staff to ensure the safety of others and the security of the institution. The appellant's allegation that the modified program is race based, punitive and in bad faith is groundless. In instances where the inmate population has engaged in an inmate initiated disturbance with another inmate faction, records support all involved populations are placed on modified programs. The appellant has been identified as a member of a security threat group with a significant level of participation in the October 11, 2011 incident. Non-affiliates are often not subject to the full extent of a modified program. At various intervals of modified programs, changes are made to allow for showering, dayroom activities, phone, yard, and other privileges for impacted inmates, commensurate with the security needs of the institution. All modified programs are monitored weekly to ensure progression is made to return the impacted inmate population to normal program as quickly as possible, yet ensuring the safety and security of the facility. The placement of an inmate population on modified program is not discriminatory and is based on the safety and security needs of the institution. Due to the above, the appellant has not supported his appeal issues.

DECISION: The appeal is denied.

(ECF No. 1 at 17-18.)

VII.  Analysis of Plaintiff's Equal Protection Claim/ Vicarious Liability

A.  Legal Standard for Equal Protection Claim

Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." Wolff v. McDonnell, 418 U.S. 539, 556 (1974) (citation omitted). Invidious racial discrimination such as racial segregation, which is unconstitutional outside prisons, also is unconstitutional within prisons. Johnson v. California, 543 U.S. 499, 505–06 (2005). A prison classification based on race is immediately suspect and is subject to the same strict scrutiny as a racial classification outside prison. Id. at 508–10. Prison officials must therefore demonstrate that the race-based policy or action is narrowly tailored to serve a compelling state interest. Id. at 510–11; Richardson v. Runnels, 594 F.3d 666, 671 (9th Cir. 2010) (applying Johnson to racial lockdowns in response to prison disturbances). Johnson did not rule out race-based classifications and did not eliminate prison security as a reason for such classifications, but instead determined that prison officials must demonstrate that race-based

13

policies are narrowly tailored to address a compelling government interest such as prison security. See Johnson, 543 U.S. at 511–13, 515 (remanding case for determination of whether Department of Corrections' policy of temporarily segregating inmates by race when they arrive in the prison system initially or are transferred to a new prison is narrowly tailored to serve a compelling state interest).

Plaintiff alleges that he put defendant Moss on notice through the appeals process that he was being subjected to allegedly unconstitutional conditions of confinement.  Because prison administrators cannot willfully turn a blind eye to constitutional violations being committed by subordinates, an individual who denies an inmate appeal and who had the authority and opportunity to prevent an ongoing constitutional violation could potentially be subject to liability if the individual knew about an existing or impending violation and failed to prevent it.  Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006).

However, in the context of a claim for unconstitutional discrimination, mere knowledge of the alleged discrimination is insufficient to impose liability on a prison, which requires purpose. Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009).  Therefore, to succeed on his racial discrimination claim against defendant Moss, plaintiff must show that defendant Moss denied his grievance with the purpose of discriminating against him.  Oregon State University Student Alliance v. Ray, 699 F.3d 1053, 1071 (9th Cir. 2012).

B.  Discussion

To the extent plaintiff argues that he should not have been transferred to NFCF in October 2011 because it was on lockdown, there is no evidence that defendant Moss participated in the decision to transfer plaintiff to NFCF.  Accordingly, defendant Moss should be granted summary judgment as to this claim.

Citing defendant Moss's declaration submitted in support of the summary judgment motion, defendants argue that defendant Moss cannot be liable for any violation of plaintiff's constitutional rights caused by the lockdown because defendant Moss had no authority to issue programming orders to NFCF.  The undersigned quotes herein, in relevant part, from defendant Moss's declaration:

14

2.   …In 2012, I became the Chief Deputy Warden at the CDCR Contracts Bed Unit ("CBU"), then the Chief in 2014.  I am still the CBU Chief as of the date of this declaration.

****

3.   Around August 2009, the United States District Court ordered the CDCR to reduce its inmate population to 137.5% of the design capacities for the prison facilities.  To that end, the CBU is a unit within the CDCR Division of Adult Institutions whose mission is to transfer inmates out of state for the purpose of temporarily alleviating overcrowding within existing institutions, and to oversee the coordination and support of a Modified Community Correctional Facility program.  In addition, CBU also manages and provides oversight to other various contracts, including the Alternative Custody Program, Medical Paroles, Contract Back Beds, and the Sacramento Control Office/Western Interstate Corrections Compact.

4.   There was an agreement in writing between the CDCR and Corrections Corporation of America ("CCA") with a term of January 7, 2008 to June 30, 2013 ("Agreement).  The stated purpose in the Agreement's recitals is "the STATE requires correctional bed space and services for STATE offenders due to continuing in-state crowding issues…"  The CCA has suitable facilities in Arizona, Mississippi and Oklahoma.

****

8.   The Agreement required the CDCR to designate a person to monitor the CCA's performance of the agreement, including their maintenance of at least four correctional institutions.

9.   The Agreement required the CCA to maintain, among other things, educational, recreational, self-help, vocational, recreational [sic], religious and visitation programs.

10.  Also per the Agreement, the CCA was obligated to report any lockdowns or modification of programs for CDCR inmate populations.  Additionally, the CCA was prohibited from unduly delaying return to normal program.  In the agreement, the CDCR did not retain the right to veto or otherwise override the CCA's programing decisions.

11.  In the Agreement, the CCA was an independent contractor and had the "sole right to manage the operations of the facility."

12.   During the October 2011 to October 2012 lockdown and modified program at-issue in this lawsuit, I was never physically present at the North Fork Correctional Facility ("NFCF") in Sayre, Oklahoma.   I did not have the authority to issue programming orders to the NFCF because they were not CDCR employees and because the Agreement afforded them the "sole right to manage the operations of the facility."  I did not participate in the NFCF's investigation related to the riot or ongoing threats of racial violence.

As an autonomous contractor facility, they were in charge of those functions.

(ECF No. 69-7 at 1-4.)

If defendant Moss had no authority to issue programming orders to NFCF, as defendants allege, then it is unclear why defendant Moss would have the authority to review plaintiff's grievance requesting that he be released from the NFCF lockdown.  Accordingly, the undersigned finds that whether defendant Moss had the authority to order NFCF officials to release plaintiff from the lockdown is a materially disputed fact.

Relying on the declaration of NFCF Warden Figueroa submitted in support of the summary judgment motion, defendants next argue that the NFCF race-based lockdown was narrowly tailored to serve the compelling state interest of institutional security.  The undersigned quotes herein, in relevant part, from Warden Figueroa's declaration:

> 3.
>
> a.  There was a major disturbance at NFCF on October 11, 2011, at 11:42 a.m., when approximately 120 Southern Hispanic and White inmates in the dining hall were battering African-American inmates in the Main Dining Hall.  A Code Response Team was assembled and staff were evacuated from the area.  Pepper spray was deployed.  Then, approximately 50 African American inmates were evacuated from the area.  The rioting inmates then began to destroy property in the Main Dining Hall and broke multiple metal objects to create weapons and stabbing tools.  There were multiple inmate injuries in the Main Dining Hall, including a head injury, broken nose, loss of consciousness, lacerations to the back of an inmate's head, missing teeth, a broken jaw, bruising to the head, lacerations to the face, lacerations to the hands and arms, a partially amputated finger and a fractured finger.
>
> b.  On the West Yard, around 11:42 a.m., approximately 30 African American and Southern Hispanic inmates began rioting and fighting.  Pepper spray was deployed.  Some of the inmates on the West Yard fled into Gym A.  Injuries on the West Yard included a head injury and a large laceration to the head.  In Gym A, approximately 75 inmates were rioting and fighting, again with Southern Hispanics attacking African American inmates.  Additional pepper spray was deployed via grenades.  The inmates in Gym A began destroying property and setting fires in the clothing exchange room.  Additional metal objects were broken and fashioned into weapons.  In Gym A, inmates were attacked with fan vents and another inmate was observed to be making a stabbing motion toward another inmate's neck.

c.   A containment fence was broken and inmates accessed the East Yard.  Another containment fence was broken and inmates accessed the Big Recreation yard.

d.   On the Big Recreation Yard, around 11;44 a.m., approximately 200 inmates massed and were rioting and fighting.  Additional CCA property was destroyed, including fences, fan vents, desks, office equipment, refrigerators, tables, brooms, mops, cleaning supplies and recreation equipment (baseball bats, gloves, weight stack equipment).  The inmates barricaded themselves and started to create weapons.  Injuries included a head injury and other trauma.

e.   In the Bravo North unit, around 11:45 a.m., inmates were rioting, destroying property, barricading themselves and attempted to break into the Officer's Office.  They also attempted to access locked cells, but the access panel had been disabled by Master Control.  A roof team was deployed and they regained control of this unit by using pepper spray grenades around 12:27 p.m.  Injuries in this area included a puncture wound to an inmate's left thigh.  Another inmate had multiple lacerations to his head, back, lip, and check along with a fractured finger.

f.   In the Hotel Alpha unit, around 11:54 a.m., approximately 80 African American and Southern Hispanic inmates were rioting, destroying property and fighting.  Control of this unit was not obtained until about 1:35 p.m.  An inmate in Hotel Alpha had cuts and lacerations to his head, above his right eye, and swelling.

g.   In the Golf Charlie unit, around 12:20 p.m., inmates were rioting and used clinched fists, feet, microwaves, property boxes, trash cans, ice chest lids, property box lids, radios and inmate manufactures weapons to attack two inmates.  Another roof team was deployed and they regained control of the unit by 2:09 p.m.  The injuries included an inmate who lost consciousness.  Another inmate had an abrasion, scratch, active bleeding and deformity to the head area.  Yet another inmate had three amputated fingers.  A fourth inmate was found unresponsive with head trauma and active bleeding.   Multiple attempted murder investigations were commenced based on incidents that occurred in Golf Charlie.

h.   In Gym B, around 11:53 a.m., approximately 60 inmates began to riot.  Southern Hispanic and White inmates again attacked African American inmates.  The African American inmates escaped to the Expansion Dining Hall and barricaded the door.  Additional property was destroyed.  At 2:24 p.m., pepper spray grenades were deployed and control was regained around 2:29 p.m.  In the kitchen, three inmates grabbed a non-inmate Canteen Supervisor and dragged her by the legs.  Other inmates came to her aid and escorted her to the Expansion Dining Hall.   Control of the Expansion Dining Hall was regained around 3:08 p.m.  An inmate in this area had a laceration to the scalp and a head injury.

i.  After the disturbance was contained, 120 weapons were

17

discovered.

j.  A true and correct, redacted copy of the facility's 5-1 A Incident Report is attached as Exhibit 1.

4.  The central theme of the disturbance was a coordinated, wide-scale attack by Southern Hispanic inmates on African American inmates.  It was subsequently theorized that the racial motivation of the disturbance was based on (1) Southern Hispanics perceived that African Americans were disrespecting them, (2) African Americans had previously failed to support Southern Hispanics while the latter engaged in a hunger strike, and (3) Northern Hispanics had been transferred away from the NFCF, leaving a power vacuum that African American inmates sought to fill.  After the disturbance, it would be expected that the African American inmates would be motivated to avenge the attack and launch one of their own, targeting Southern Hispanics.

5.  After a disturbance of this magnitude, the appropriate correctional response is to place the institution on lockdown pending an investigation into the causes of the disturbance, including investigation into racial tension that might indicate future violence; investigation related to whether the correctional officers' response and uses of force were reasonable and consistent with policy; gather evidence for referral to the local prosecuting agency for criminal charges; gather evidence for disciplinary proceedings against inmates; repair the facility and search for any new inmate-manufactured weapons.  The facility would also start reviewing inmate mail for indicia of continued racial tensions and would interview inmates periodically to gather information on ongoing threats.  I ordered that all off these things commence as soon as feasible.

6.  On October 14, 2011, an NFCF employee took a statement from an inmate.  The inmate reported that "the Mexicans are going to target staff next and it is not safe to open cell doors."  The inmate also stated he "won't feel better till revenge was had."  Attached as Exhibit 2 is a true and correct, redacted copy of this 5-1C Incident Statement.

7.  On October 15, 2011, an NFCF employee reported overhearing inmates who were discussing the riot say that "this situational is not over yet.  When the Black and the Hispanics come up off lockdown the Blacks are going to retaliate and make the incident from Tuesday look small."  The inmates "wanted to get even" and "it will happen to the Hispanics and the staff if they get in the way." Attached as Exhibit 3 is a true and redacted copy of this 5-1C Incident Statement.

8.  On January 10, 2012, I generated a memorandum to CDCR Associate Warden Mike Williams titled "Threat Assessment of Riot Involving Black and Southern Hispanic Inmates at North Fork Correctional Facility."  In that memorandum, I documented that on October 17, 2011, eight inmate manufactured weapons had been found and that review of the videotapes of the incident had not yet

been completed, as there were approximately 140 cameras at the facility, running 24 hours per day. In addition, 262 inmates had been placed in administrative segregation due to the incident, which itself generates a host of institutional procedures that must be followed. The hearings on all of the inmate rules violation reports and disciplinary proceedings had not been completed. NFCF had also conducted an unclothed body search of every inmate for injuries or marks consistent with being involved in the disturbance. Inmate interviews commenced on October 12, 2011 and as of January 10, 2012, 980 had been completed. We conducted an additional 1,084 inmate interviews between December 20-27, 2011. The feedback we got from the inmates was that there was still a racial issue between Southern Hispanics and African Americans and "the situation is not finished and will continue once let up from lockdown." I further documented that NFCF staff "continued to observe tension amongst the Blacks and the other races in the housing units." Following the disturbance, inmate representatives from the Men's Advisory Committee also toured the housing units to discuss issues pertinent to the disturbance with the inmates. They discovered that African Americans "are not going to 'let it go'" while referring to the actions taken by the Hispanic participants of the disturbance. I recommended that 180 inmates who were active participants in the incident be removed from NFCF and that the inmate population once again be interviewed.

9. After a racially motivated disturbance occurs, prison officials usually restore programs by "phase unlock." Under this gradual method, programs are restored to inmate populations and subgroups only when it is safe to do so and on a smaller, test population basis. Once a particular group is allowed to resume a program, staff will monitor that group's progress and ability to program before allowing another group to also resume that program. Programs are restored in small, incremental steps so that any potentially recurring violent behavior will be smaller in scale and more easily controlled. Typically, the phase unlock will grant programs to the older inmate populations first, since the majority of the institutional violence is attributed to the younger inmates.

10. Depending on the population, inmates in prison are frequently known to self-segregate by race and then form management ranks within each race. In my experience, this was true of the CDCR inmate population at NFCF. Consequently, inmates in a particular racial group may be required to attack other inmates on the basis of their race or use violence to protect members of their own race. If inmates do not comply with their internal race management, they may themselves be targets for violence. For this reason, it was impossible to distinguish between members of a race who were present participants in the disturbance as opposed to those who arrived shortly after, like plaintiff.

11. I am aware that plaintiff, who is African American, arrived at NFCF after the disturbance. He had to be included in the restrictions on African Americans and Southern Hispanics, despite not being present for the incident, for several reasons. First, overwhelming intelligence indicated that Southern Hispanics were

being ordered to attack African Americans without discriminating on the basis of who was present for the October 11, 2011 incident. Plaintiff was therefore a target on the basis of his race alone. Second, African Americans had been ordered to attack Southern Hispanics, on pain of retaliation, without regard to whether the African American was present on October 11, 2011 and regardless of their gang affiliation. These are unfortunate aspects of prison life, but plaintiff's program restrictions were necessary for his personal safety and not over-inclusive.

12.  NFCF was contractually required to create Form CDCR 3022-B Program Status Reports ("PSRs") to convey to the California Out of State Correctional Facility ("COCF") arm of CDCR what was being conveyed to staff and inmates regarding which programs were being offered and to which groups.   These PSRs were assigned number 11-10-0043.  The programs that might be affected included inmate movement, feeding, ducats, visiting, work, showers, medical, dayroom, recreation, canteen, packages, telephone calls, legal library and religious services.  All of the Form CDCR 3022-B PSR Plan B Plan of Operation/Staff & Inmate Notifications are attached to this declaration as Exhibit 4, bates stamped PSR Plan B 1-162.  The PSRs were made at or near the time of the program decision, by a person with knowledge, kept in the regular course of correctional business and the PSRs were a regular practice of our correctional activity.

13.  According to PSR Plan B 001, dated October 11, 2011, with an effective date of October 12, 2011, the entire inmate population at NFCF was placed on lockdown as a result of the disturbance and subsequent declaration of a state of emergency.   Once programs were restored, the NFCF went from a state of "lockdown" to a "modified program" status.

14.  According to PSR Plan B 003, as of April 2, 2012, we had restored normal programming to all inmates, except inmates classified African American or Southern Hispanic.  The African American and Southern Hispanic inmates were still under the modified program and had the following restrictions:  all movement out of cell had to be by escort, with unclothed body search prior, segregated by race and at a maximum ratio of five inmates per one correctional officer; all meals were served in the cell only, as opposed to larger dining halls; visitation was segregated so that Southern Hispanics and African Americans alternated days from Monday to Friday, with no visitation on Wednesdays; neither race was offered vocational opportunities; showers were segregated by race; dayroom access and out of cell recreation were prohibited; the inmates were allowed telephone calls, canteen and law library access, however religious services were limited to cell side by chaplains who made rounds.

15. I delayed the phase unlock for Southern Hispanic and African American inmates due to ongoing concerns that those inmate populations were determined to riot again and attack one another. These concerns were based on my training and experience as a correctional employee, our investigation and the history of racial

20

politics at NFCF and intelligence we obtained from the inmates themselves.  For example, on May 21, 2012, we received a note from an inmate that read, "There are many blacks who are very mad at what happened and we plan on getting even.  This is no joke and you better be ready.  Anyone envolved [sic] needs to be moved out or this will never be over.  We ain't rolling over."  On May 29, 2012, we received another inmate note, directed to the "unet [sic] manger [sic]."  This note read "word came from Califoia [sic] to do eny ]sic] thing possible to take out the Blacks when The South Side comes out and The Surenos are told not to take mercy or pay the consacuens [sic] them selfs [sic] so I thik [sic] you should let both rases [sic] cool down for a little more or git [sic] ready for wore [sic]…" True and correct copies of the inmate notes are attached to this declaration as Exhibits 5 and 6.

16.   The mainstay of the phase unlock began for the Southern Hispanic and African American inmates around June 2012.  While I was not present during the phase unlock, the pertinent records of the unlock document the following timeline.

17.   According to PSR Plan B 078-79, Southern Hispanics and African Americans over age 40 were given day room access starting June 29, 2012.

18.   According to PSR Plan B 092-93, Southern Hispanics and African Americans over age 40 were given out of cell recreation on August 24, 2012.  In addition, day room access was broadened to include Southern Hispanics and African Americans over age 34.

19.  According to PSR Plan B 104-105, on September 4, 2012, day room access was broadened to include Southern Hispanics and African Americans over age 31.

20.  According to PSR Plan B 112-113, on September 11, 2012, day room access was broadened to include Southern Hispanics and African Americans over age 28.

21.   According to PSR Plan B 120-121, Southern Hispanics and African Americans over age 35 were given out of cell recreation on September 17, 2012.  In addition, day room access was broadened to include Southern Hispanics and African Americans over age 25.

22.   According to PSR Plan B 140-141, Southern Hispanics and African Americans over age 30 were given out of cell recreation on October 1, 2012.  In addition, day room access was broadened to include Southern Hispanics and African Americans over age 22.

23.   According to PSR Plan B 150-151, Southern Hispanics and African Americans over age 25 were given out of cell recreation on October 8, 2012.

24.   According to PSR Plan B 160-161, Southern Hispanics and African Americans received normal programming on October 15, 2012.

25.  While I was Warden of NFCF, the PSRs were signed by me as Warden of NFCF or by my designee, in accordance with CCA's contractual obligation to CDCR and I had plenary authority to manage the facility's programs and was responsible for the safety and security of the inmate population.  No one at the CDCR caused any delay in our ability to restore NFCF programming.

26.  My programming decisions at NFCF were necessary and based on intelligence backed security concerns, the safety of our staff and the safety of our Southern Hispanic and African American inmate populations.  At no time did I intentionally discriminate against either population and I was never deliberately indifferent to either inmate population's programming needs.

27.  In my opinion, based on NFCF records, my training and experience in corrections and my personal experience at NFCF, I believe that the duration of this lockdown and modified program were reasonable, necessary, and they were narrowly tailored to further a compelling interest of institutional security and safety.

(ECF No. 69-2 at 2-10.

The undersigned again observes that plaintiff's Equal Protection claim does not challenge the imposition or duration of the lockdown per se.  Instead, plaintiff claims that he should not have been put on lockdown because he was not present at NFCF when the incident occurred.

Based on Warden Figueroa's declaration quoted above, the undersigned finds that the decision to put plaintiff on lockdown, although he was not present at NFCF on October 11, 2011, was narrowly tailored to serve the compelling state interest of prison security.  While plaintiff did not participate in the October 11, 2011 incident, prison officials put plaintiff on lockdown because they reasonably concluded that plaintiff faced significant security risks from both Southern Hispanics and other African American inmates.

To the extent plaintiff suggests that he should have been the only African American inmate not on lockdown, plaintiff offers no evidence as to whether this was a plausible alternative to putting him on lockdown.  Plaintiff offers no evidence as to whether his safety needs would have been protected were he not placed on lockdown.

For the reasons discussed above, the undersigned finds that the decision to retain plaintiff on lockdown did not violate his Equal Protection rights.  Therefore, defendant Moss did not purposefully discriminate against plaintiff when he denied plaintiff's second level grievance.  Accordingly, defendant Moss should be granted summary judgment as to this claim.

22

C. Qualified Immunity

Although defendant Moss should be granted summary judgment as to the merits of plaintiff's Equal Protection claim, the undersigned briefly addresses defendants' argument that defendants are entitled to qualified immunity as to this claim.

*Legal Standard*

"[Q]ualified immunity is an affirmative defense and ... the burden of pleading it rests with the defendant." Crawford-El v. Britton, 523 U.S. 574, 587 (1998). Deciding qualified immunity entails a two-step analysis. Once a court determines that a constitutional violation occurred the court must then inquire whether the right violated was "clearly established" by asking whether a reasonable officer could believe that his actions were lawful. Oxborro v. City of Coalinga, 559 F.Supp.2d 1072, 1080 (E.D. 2008) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001).) "In the second step, the court must ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted. Although this inquiry is primarily a legal one, where the reasonableness of the officer's belief that his conduct was lawful 'depends on the resolution of disputed issues of fact ... summary judgment is not appropriate.'" Id. (citing Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003).)

*Discussion*

Defendants argue that they are entitled to qualified immunity because they are not aware of any Ninth Circuit equal protection cases in the context of a lockdown or modified program which would place defendants on notice that their conduct in California was unconstitutional, given that the alleged discrimination occurred at a Sayre, Oklahoma, privatized, contractor prison which had contractually reserved the sole right to manage the operations of its facility. (ECF No. 69 at 27.) In support of this argument, defendants cite several published and unpublished Ninth Circuit cases addressing prison lockdowns. Defendants argue that none of these cases explore or address the situation that is presented in the instant action. Defendants argue that these cases all involve challenges by California state prisoners to race based lockdowns in California prisons.

Defendants' argument for qualified immunity presupposes that defendant Moss had no authority over programming orders at NFCF, such as whether to retain plaintiff in lockdown.

1    However, as discussed above, whether defendant Moss had the authority to issue programming

2    orders is a disputed material fact.  Accordingly, defendant Moss is not entitled to qualified

3    immunity.  See Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007) (summary

4    judgment is appropriate only if defendants are entitled to qualified immunity on the facts as

5    alleged by the non-moving party).

6    VIII.  Eighth Amendment

7         Plaintiff alleges that the denial of access to work, educational and recreation activities

8    during the lockdown violated his Eighth Amendment rights.[4]  Defendants first move for

9    summary judgment as to plaintiff's Eighth Amendment claim on grounds that defendant Moss

10   had no involvement or oversight over the lockdown program.  As discussed above, whether

11   defendant Moss had the authority to order plaintiff's release from the lockdown, and grant his

12   request for exercise, is a materially disputed fact.

13        Defendants next argue that defendant Moss should be granted summary judgment as to the

14   merits of plaintiff's Eighth Amendment claim.

15        To establish that a lockdown created conditions of confinement that violated the Eighth

16   Amendment, the prisoner must establish first, that he was deprived of the "minimal civilized

17   measure of life's necessities," and second, that defendants acted with deliberate indifference to his

18   health and safety.  Farmer v. Brennan, 511 U.S. 825, 834-35 (1994).

19        Prisoners have no constitutional right to work or to education.  See Baumann v. Arizona

20   Dept. of Corrections, 754 F.2d 841, 845 (9th Cir. 1985) (no constitutional right to work); Rhodes

21   v. Chapman, 452 U.S. 337, 348 (1981) (no constitutional right to education).  Therefore, the

22   denial of access to work and educational activities during the lockdown did not violate plaintiff's

23   Eighth Amendment rights.  Accordingly, defendant Moss should be granted summary judgment

24   _____

25   [4]   In the summary judgment motion, defendants argue that plaintiff does not clearly raise an
     Eighth Amendment claim, but they address the Eighth Amendment in their motion out of an

26   abundance of caution.  In the amended complaint, plaintiff alleges an Eighth Amendment claim.
     (ECF No. 17 at 3, 5: 20.)  In their motion to dismiss for failure to state a claim pursuant to Federal

27   Rule of Civil Procedure 12(b)(6) (ECF No. 32), defendants did not argue that plaintiff's Eighth
     Amendment claim was not adequately pled or otherwise address plaintiff's Eighth Amendment

28   claim.

1     as to these claims.

2           For the reasons discussed herein, the undersigned finds that defendant Moss is entitled to

3     qualified immunity as to plaintiff's Eighth Amendment claim challenging the denial of outdoor

4     exercise.  The parties do not dispute that plaintiff was denied outdoor exercise for the

5     approximately 11 months plaintiff was on lockdown/modified program.

6           "Although exercise is one of the basic human necessities protected by the Eighth

7     Amendment, a temporary denial of outdoor exercise with no medical effects is not a substantial

8     deprivation."  May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997).  A finding that the purpose of

9     the lockdown was to "prevent further attacks, injuries, and homicides" will generally defeat an

10    argument that prison officials acted with deliberate indifference.  See Norwood v. Woodford, 661

11    F.Supp.2d 1148, 1157 (S.D.Cal. 2007).

12          In Noble v. Adams, 646 F.3d 1138 (9th Cir. 2011), first issued on March 17, 2011, and

13    amended on August 2, 2011, the Ninth Circuit determined that prison officials were entitled to

14    qualified immunity with respect to a seven-month lockdown following a prison riot, as

15                    it was not clearly established in 2002—nor is it established yet—
16                precisely how, according to the Constitution, or when a prison
                  facility housing problem inmates must return to normal operations,
17                including outside exercise, during and after a state of emergency
                  called in response to a major riot, here one in which inmates
18                attempted to murder staff.

19    Noble v. Adams, 646 F.3d at 1143 (emphasis added).

20          The Ninth Circuit reiterated in Noble that prison officials are entitled to "wide-ranging

21    deference" and courts must defer to prison officials' judgment as long as it does not manifest

22    deliberate indifference or an intent to inflict harm.  Id.  The court also noted that after the attack

23    on the exercise yard against correctional staff, prison officials were justified in declaring an

24    emergency and imposing a lockdown, which by definition precluded typical outdoor exercise,

25    until prison officials could gradually restore it.  Id. at 1144.  The court observed that responsible

26    officials were constantly reviewing the lockdown to determine how and when to safely lift it.  Id.

27    at 1147.  In this regard, the Ninth Circuit found that prison officials were not deliberately

28    indifferent, and the lockdown was not in excess of what was necessary to restore order.  Id. at

1148.

Pursuant to <u>Noble</u>, defendant Moss is entitled to qualified immunity.  The incident in the instant case occurred approximately two months after <u>Noble</u> was decided.  As of October 2011, it was still not clearly established how long a prison could remain on lockdown before violating the inmates' constitutional rights.

As in <u>Noble,</u> the "incident" in the instant action involved a major riot.  Defendants have presented sufficient evidence showing that security concerns justified imposing the lockdown in October 2011, and maintaining the lockdown and modified programs through October 2012, when all inmates received normal programming.  In his declaration, Warden Figueroa discusses the interviews and investigations into January 2012 that revealed ongoing racial tensions.  Warden Figueroa also cites the inmate notes found in May 2012, which demonstrated ongoing racial tensions.  While defendants have not provided specific evidence regarding investigations or other evidence of ongoing racial tension from January 2012 to when the inmate notes were discovered in May 2012, the court cannot conclude from this evidentiary gap that the lockdown/modified program was no longer warranted.  This court is not in the position to lightly second guess the expert judgment to make the decisions regarding when to ease restrictions, <u>Norwood v. Vance</u>, 591 F.3d 1062, 1069 (9th Cir. 2009), or otherwise micromanage prisons.  <u>Noble</u>, 646 F.3d at 1143.[5]

---

[5]  In <u>Noble</u>, the Ninth Circuit found that the district court erred in finding that the lack of evidence of new disruptive events did not support the ongoing lockdown:

> The district court erred in viewing the end on January 30, 2002 of the formal investigation of the immediate precipitating causes of the riot, which in any event was not conclusive, as a point from which the officials must demonstrate additional "specific facts" or new disruptive events supporting their judgment that the emergency had not dissipated and that the lockdown must continue. The absence of any additional disruptive events was a good sign, but hardly one that signaled the evaporation of the tension that sparked this riot and clearly continued in its aftermath. The district court's approach manifestly trespassed against our warnings not to micro-manage prisons. Moreover, the absence of any new attacks demonstrates, if anything, appropriate prudence and the success of the lockdown, not that it might lack a "penological purpose."

<u>Noble</u>, 646 F.3d at 1147.

1    In any event, plaintiff does not seriously dispute that the purpose of the lockdown was to

2  maintain prison security.  Plaintiff also does not seriously dispute that ongoing security concerns

3  warranted maintaining the lockdown and modified program until October 2012.  Plaintiff's main

4  claim is that he should not have been placed on lockdown because he was not at NFCF when the

5  riot occurred.  However, as discussed above, defendants have demonstrated, by way of Warden

6  Figueroa's declaration, that placing plaintiff on the lockdown was legitimately for his own

7  protection.

8    As mentioned above, in <u>Noble</u>, the Ninth Circuit found that prison officials were entitled

9  to qualified immunity because they regularly reviewed the lockdown to determine whether

10  restrictions could be eased.  In the instant case, defendants have provided "Program Status

11  Report" forms signed by Warden Figueroa and Warden Perez, reflecting their regular reviews of

12  the lockdown following implementation of the modified programs in April 2012 through the

13  conclusion of the phased unlock in October 2012.  (ECF No. 69-4 at 4-78; ECF No. 69-5.)

14  Defendants do not specifically address the type and frequency of reviews of the lockdown

15  occurring prior to April 2012.  However, in his June 2012 response to plaintiff's grievance,

16  defendant Moss states that the lockdown/modified program was reviewed weekly to determine

17  whether restrictions could be eased.  Therefore, by the time defendant Moss reviewed plaintiff's

18  grievance, it is clear that NFCF officials regularly reviewed the status of the lockdown.

19    There is no evidence raising a genuine dispute as to any material fact regarding the need

20  for the lockdown/modified program, or the need to lift the lockdown in measured phases.  <u>Noble</u>,

21  646 F.3d at 1144.  There is no evidence that defendant Moss acted with deliberate indifference in

22  denying plaintiff's grievance requesting that he be released from the modified program and

23  allowed outdoor exercise.  Accordingly, defendant Moss should be granted summary judgment on

24  grounds that he is entitled to qualified immunity pursuant to <u>Noble</u>, <u>supra</u>.

25  IX.  <u>Plaintiff's Motion for a Settlement Conference</u>

26    On June 1, 2016, plaintiff filed a motion for a settlement conference and for the court to

27  rule in "favor of plaintiff in summary" (docketed as a motion for summary judgment).  (ECF No.

28  65).  Because the undersigned recommends that defendants' motion for summary judgment be

27

granted, plaintiff's motion for a settlement conference and for a ruling in his favor is denied.

Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for a settlement conference and for a ruling in his favor (docketed as a summary judgment motion) (ECF No. 65) is denied;

IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 69) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  December 6, 2016

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Gr1867.sj

28